F. #2016R00695

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

     - against –

CREDIT SUISSE SECURITIES (EUROPE)
LIMITED,
          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

PLEA AGREEMENT

Cr. No. <u>21-520 (WFK)</u>

     The United States of America, by and through the United States Department of Justice, Criminal Division, Money Laundering and Asset Recovery Section and Fraud Section, and the United States Attorney's Office for the Eastern District of New York (collectively, the "Offices") and Credit Suisse Securities (Europe) Limited (the "Defendant" or the "Company"), by and through its undersigned attorneys, and through its authorized representative, pursuant to authority granted by the Defendant's Board of Directors, hereby submit and enter into this plea agreement (the "Agreement"), pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. The terms and conditions of this Agreement are as follows:

THE DEFENDANT'S AGREEMENT

     1.     Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the Defendant agrees to waive its right to grand jury indictment and to challenge venue in the United States District Court for the Eastern District of New York, and to plead guilty to a criminal Information charging the Defendant with conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349 (the "Information"). The Defendant further agrees to persist in that plea through sentencing and, as set forth below, to cooperate fully with the Offices in their investigation into

COURT'S
EXHIBIT NO. 3
IDENTIFICATION/EVIDENCE
DKT.# 21CR520
DATE: 10/19/21
PENGAD 800-631-6989

the conduct described in this Agreement and other conduct related to the conduct described in this Agreement and the Statement of Facts attached hereto as Attachment A (the "Statement of Facts").

2.    The Defendant understands that, to be guilty of this offense, the following essential elements of the offense must be satisfied:

    a.    two or more persons entered into an agreement to commit wire fraud;

    b.    that the defendant knowingly and intentionally became a member of the conspiracy;

    c.    that there was a scheme or artifice to defraud or to obtain money or property by false and fraudulent pretenses, representations or promises;

    d.    that the defendant knowingly and willfully participated in the scheme or artifice to defraud, with knowledge of its fraudulent nature and with specific intent to defraud; and

    e.    that in the execution of that scheme, the defendant used or caused the use of interstate wires or international wires.

3.    The Defendant understands and agrees that this Agreement is between the Offices and the Defendant and does not bind any other division or section of the Department of Justice or any other federal, state, local, or foreign prosecuting, administrative, or regulatory authority. Nevertheless, the Offices will bring this Agreement and the nature of the conduct, the nature and quality of the cooperation and remediation of the Defendant, its direct or indirect affiliates, parent companies, subsidiaries, and joint ventures, to the attention of other law enforcement,

regulatory, and debarment authorities, as well as those of Multilateral Development Banks ("MDBs"), if requested by the Defendant.

4.     The Defendant agrees that this Agreement will be executed by an authorized corporate representative.  The Defendant further agrees that a resolution duly adopted by the Defendant's Board of Directors, in the form attached to this Agreement as Attachment B ("Certificate of Corporate Resolutions"), authorizes the Defendant to enter into this Agreement and take all necessary steps to effectuate this Agreement, and that the signatures on this Agreement by the Defendant and its counsel are authorized by the Defendant's Board of Directors, on behalf of the Defendant.

5.     The Defendant agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under the Agreement.

6.     The Offices enter into this Agreement based on the individual facts and circumstances presented by this case, including:

a.     Credit Suisse Group AG (the "Parent Company") is entering into a Deferred Prosecution Agreement ("DPA") simultaneously to the Defendant entering its guilty plea, relating to the same conduct as set forth in the Statement of Facts;

b.     the Defendant and the Parent Company did not receive voluntary disclosure credit pursuant to the FCPA Corporate Enforcement Policy in the Department of Justice Manual ("JM") § 9-47.120, or pursuant to the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines"), because they did not voluntarily and timely self-disclose to the Offices the conduct described in the Statement of Facts, attached to this Agreement as Attachment A;

3

c.      the Defendant and Parent Company received partial credit for their cooperation with the Offices' investigation pursuant to the FCPA Corporate Enforcement Policy, JM 9-47.120 by, among other things: (i) collecting and producing voluminous evidence located in other countries; (ii) voluntarily making foreign-based employees available for interviews in the United States; (iii) making regular factual presentations and updates to the Offices; (iv) ultimately meeting requests from the Offices promptly; and (v) voluntarily providing information and making foreign-based employees available to testify at trial;

d.      the Defendant and Parent Company did not receive full credit for their cooperation because the Defendant and Parent Company significantly delayed producing relevant evidence, including recorded phone calls in which the Parent Company's employees discussed concerns relating to conduct set forth in the Statement of Facts;

e.      the Defendant and Parent Company ultimately provided to the Offices all relevant facts known to them, including information about the individuals involved in the misconduct;

f.      the Defendant and Parent Company engaged in remedial measures, including: (i) implementing additional controls, procedures, and policies related to government-backed loans; (ii) disciplining or withholding compensation for certain employees involved in the conduct; and (iii) providing additional compliance training to current employees;

g.      the Parent Company has committed to continuing to enhance its compliance program and internal controls, including ensuring that the compliance program meets the minimum requirements set forth in Attachment C to the Parent Company's DPA;

h.      based on the Defendant's and the Parent Company's remediation, the state of their compliance program, and the Parent Company's agreement to report to the Offices as set forth in Attachment D to the Parent Company's DPA, the Offices determined that an independent compliance monitor is unnecessary;

i.      the Parent Company's agreement to concurrently resolve (i) an additional investigation by the United States Securities and Exchange Commission ("SEC") relating to the conduct described in the Statement of Facts by settling an Administrative Action and agreeing to pay $65 million in civil monetary penalties and $34,051,72 in disgorgement and prejudgment interest and (ii) an additional investigation by the United Kingdom's Financial Conduct Authority ("FCA") relating to the conduct described in the Statement of Facts by settling a Regulatory Action and agreeing to pay $200,664,504 in penalty and an irrevocable undertaking of $200 million of debt relief to Mozambique;

j.      the nature, seriousness and pervasiveness of the offense conduct, including, among other things, the involvement of executives and high-level employees, making materially false statements in offering documents, and the diversion of loan funds that were used to pay kickbacks to three Company employees and bribes to senior Mozambican government officials over a period of years;

k.      the Defendant and the Parent Company have agreed to continue to cooperate with the Offices in any ongoing investigation as described in Paragraphs 9 and 10 below and Paragraph 5 of the Parent Company's DPA;

5

l.      Accordingly, after considering (a) through (k) above, the Defendant and Parent Company received a discount of fifteen (15) percent off of the bottom of the otherwise applicable Sentencing Guidelines fine range for the conduct described in the Statement of Facts.

7.      The Defendant agrees to abide by all terms and obligations of the Agreement as described herein, including, but not limited to, the following:

a.      to plead guilty as set forth in the Agreement;

b.      to abide by all sentencing stipulations contained in the Agreement;

c.      to appear, through its duly appointed representatives, as ordered for all court appearances, and obey any other ongoing court order in this matter, consistent with all applicable U.S. and foreign laws, procedures, and regulations;

d.      to commit no further crimes;

e.      to be truthful at all times with the Court;

f.      to pay the applicable fine and special assessment;

g.      to cooperate fully with the Offices as described in Paragraphs 9 and 10;

h.      to work with the Parent Company in fulfilling the obligations of the Parent Company's DPA; and

8.      Except as may otherwise be agreed by the parties in connection with a particular transaction, the Defendant agrees that in the event that, during the term of the Parent Company's DPA (the "Term"), the Defendant undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Defendant's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the Statement of Facts, as they exist as of the date of this Agreement, whether such sale is

structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the Offices' ability to declare a breach under this Agreement is applicable in full force to that entity. The Defendant agrees that the failure to include these provisions in the transaction will make any such transaction null and void. The Defendant shall provide notice to the Offices at least 30 days prior to undertaking any such sale, merger, transfer, or other change in corporate form. If the Offices notify the Defendant prior to such transaction (or series of transactions) that they have determined that the transaction or transactions have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined in the sole discretion of the Offices, the Defendant agrees that such transaction or transactions will not be consummated. In addition, if at any time during the Term of the Agreement the Offices determine in their sole discretion that the Defendant has engaged in a transaction or transactions that have the effect of circumventing or frustrating the enforcement purposes of this Agreement, they may deem them a breach of this Agreement pursuant to Paragraphs 22 to 25 of this Agreement. Nothing herein shall restrict the Defendant from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Offices.

9.      The Defendant shall, subject to applicable law and regulations, cooperate fully with the Offices in any and all matters relating to the conduct described in the Agreement and the

7

Statement of Facts and other conduct under investigation by the Offices or any other component of the Department of Justice at any time during the Term until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term. At the request of the Offices, the Defendant shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies, as well as the MDBs in any investigation of the Defendant, the Parent Company, its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and the Statement of Facts and any other conduct under investigation by the Offices or any other component of the Department of Justice. The Defendant's cooperation pursuant to this Paragraph is subject to applicable laws and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Defendant must provide to the Offices a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Defendant bears the burden of establishing the validity of any such assertion. The Defendant agrees that its cooperation pursuant to this Paragraph shall include, but not be limited to, the following:

a.      The Defendant shall truthfully disclose all factual information not protected by a valid claim of attorney-client privilege or work product doctrine with respect to its activities, those of its Parent Company, subsidiaries and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Defendant has any knowledge or about which the Offices may inquire. This obligation of truthful disclosure includes, but is not

8

limited to, the obligation of the Defendant to provide to the Offices, upon request, any document, record or other tangible evidence about which the Offices may inquire of the Defendant.

b.      Upon request of the Offices, the Defendant shall designate knowledgeable employees, agents or attorneys to provide to the Offices the information and materials described in Paragraph 9(a) above on behalf of the Defendant. It is further understood that the Defendant must at all times provide complete, truthful, and accurate information.

c.      The Defendant shall use its best efforts to make available for interviews or testimony, as requested by the Offices, present or former officers, directors, employees, agents and consultants of the Defendant. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Defendant, may have material information regarding the matters under investigation.

d.      With respect to any information, testimony, documents, records or other tangible evidence provided to the Offices pursuant to this Agreement, the Defendant consents to any and all disclosures, subject to applicable law and regulations, to other governmental authorities, including United States authorities and those of a foreign government, as well as the MDBs, of such materials as the Offices, in their sole discretion, shall deem appropriate.

10.     In addition to the obligations in Paragraph 9, during the Term, should the Defendant learn of any evidence or any allegations of conduct that may constitute a violation of federal wire fraud, securities laws, money laundering laws or the Foreign Corrupt Practices Act ("FCPA"), had the conduct occurred within the jurisdiction of the United States, the Defendant

shall promptly report such evidence or allegation to the Offices. Thirty days prior to the end of the Term, the Defendant, by the Chief Executive Officer of the Defendant and the Chief Financial Officer of the Defendant, will certify, in the form of executing the document attached as Attachment C to this Agreement, to the Offices that the Defendant has met its disclosure obligations pursuant to this Paragraph. Each certification will be deemed a material statement and representation by the Defendant to the executive branch of the United States for purposes of Title 18, United States Code, Sections 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

11.    The Defendant agrees that any fine imposed by the Court will be due and payable as specified in Paragraph 19 below, and that any restitution imposed by the Court will be due and payable in accordance with the Court's order. The Defendant further agrees to pay to the Clerk of the Court for the United States District Court for the Eastern District of New York the mandatory special assessment of $400 (pursuant to Title 18, United States Code, Section 3013(a)(2)(B)) within 10 business days from the date of sentencing.

<u>THE UNITED STATES' AGREEMENT</u>

12.    In exchange for the guilty plea of the Defendant and the complete fulfillment of all of its obligations under this Agreement, the Offices agree that they will not file additional criminal charges against the Defendant, the Parent Company, or any of its direct or indirect affiliates, subsidiaries or joint ventures relating to any of the conduct described in the Statement of Facts or the Information filed pursuant to this Agreement. The Offices, however, may use any information related to the above referenced conduct against the Defendant: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a

10

prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code. This Agreement does not provide any protection against prosecution for any future conduct by the Defendant or any of its direct or indirect subsidiaries. In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Defendant. The Defendant agrees that nothing in this Agreement is intended to release the Defendant from any and all of the Defendant's tax liabilities and reporting obligations for any and all income not properly reported and/or legally or illegally obtained or derived.

FACTUAL BASIS

13.     The Defendant is pleading guilty because it is guilty of the charge contained in the Information. The Defendant admits, agrees, and stipulates that the factual allegations set forth in the Information and the Statement of Facts are true and correct, that it is responsible for the acts of its officers, directors, employees, and agents described in the Information and the Statement of Facts, and that the Information and the Statement of Facts accurately reflect the Defendant's criminal conduct. The Defendant stipulates to the admissibility of the Statement of Facts in any proceeding by the Offices, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the attached Statement of Facts at any such proceeding.

## THE DEFENDANT'S WAIVER OF RIGHTS, INCLUDING THE RIGHT TO APPEAL

14.     Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 limit the admissibility of statements made in the course of plea proceedings or plea discussions in both civil and criminal proceedings, if the guilty plea is later withdrawn. The Defendant expressly warrants that it has discussed these rules with its counsel and understands them. Solely to the

11

extent set forth below, the Defendant voluntarily waives and gives up the rights enumerated in Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410. The Defendant agrees that, effective as of the date the Defendant signs this Agreement, it will not dispute the Statement of Facts set forth in this Agreement, and that the Statement of Facts shall be admissible against the Defendant in any criminal case involving any of the Offices and the Defendant, as: (a) substantive evidence offered by the government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and (c) evidence at any sentencing hearing or other hearing. In addition, the Defendant also agrees not to assert any claim under the Federal Rules of Evidence (including Rule 410 of the Federal Rules of Evidence), the Federal Rules of Criminal Procedure (including Rule 11 of the Federal Rules of Criminal Procedure), or the Sentencing Guidelines (including U.S.S.G. § 1B1.1(a)) that the Statement of Facts set forth in this Agreement should be suppressed or is otherwise inadmissible as evidence (in any form). Specifically, the Defendant understands and agrees that any statements that it makes in the course of its guilty plea or in connection with the Agreement are admissible against it for any purpose in any U.S. federal criminal proceeding if, even though the Offices have fulfilled all of their obligations under this Agreement and the Court has imposed the agreed-upon sentence, the Defendant nevertheless withdraws its guilty plea.

15.     The Defendant is satisfied that the Defendant's attorneys have rendered effective assistance. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as provided in this Agreement. The Defendant understands that the rights of criminal defendants include the following:

a.     the right to plead not guilty and to persist in that plea;

b.      the right to a jury trial;

c.      the right to be represented by counsel – and if necessary have the court appoint counsel – at trial and at every other stage of the proceedings;

d.      the right at trial to confront and cross-examine adverse witnesses, to be protected from compelled self-incrimination, to testify and present evidence, and to compel the attendance of witnesses; and

e.      pursuant to Title 18, United States Code, Section 3742, the right to appeal the sentence imposed.

Nonetheless, the Defendant knowingly waives the right to appeal or collaterally attack the conviction and any sentence within the statutory maximum described below (or the manner in which that sentence was determined) on the grounds set forth in Title 18, United States Code, Section 3742, or on any ground whatsoever except those specifically excluded in this Paragraph, in exchange for the concessions made by the Offices in this Agreement. The Agreement does not affect the rights or obligations of the Offices as set forth in Title 18, United States Code, Section 3742(b). The Defendant also knowingly waives the right to bring any collateral attack challenging either the conviction or the sentence imposed in this case. The Defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, Title 5, United States Code, Section 552, or the Privacy Act, Title 5, United States Code, Section 552a. The Defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution related to the

conduct described in the Information and the Statement of Facts including any prosecution that is not time-barred on the date that this Agreement is signed in the event that: (a) the conviction is later vacated for any reason; (b) the Defendant violates the Agreement; or (c) the plea is later withdrawn, provided such prosecution is brought within one year of any such vacation of conviction, violation of the Agreement, or withdrawal of plea plus the remaining time period of the statute of limitations as of the date that this Agreement is signed. The Offices are free to take any position on appeal or any other post-judgment matter. The parties agree that any challenge to the Defendant's sentence that is not foreclosed by this Paragraph will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver. Nothing in the foregoing waiver of appellate and collateral review rights shall preclude the Defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

PENALTY

16.    The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1349, is: a fine of $500,000 or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest (Title 18, United States Code, Section 1343 and Title 18, United States Code, Sections 3571(c) and (d)); five years' probation (Title 18, United States Code, Section 3561(c)(1)); a mandatory special assessment of $400 per count (Title 18, United States Code, Section 3013(a)(2)(B)); and restitution in the amount of any victims' losses as ordered by the Court. In this case, the parties agree that the gross pecuniary loss resulting from the offense is approximately $208,000,000. Therefore, pursuant to Title 18, United States Code, Section 3571(d), the maximum fine that may be imposed is twice the gross gain, or approximately $416,000,000 per offense.

14

## SENTENCING RECOMMENDATION

17.    The parties agree that pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Court must determine an advisory sentencing guideline range pursuant to the Sentencing Guidelines. The Court will then determine a reasonable sentence within the statutory range after considering the advisory sentencing guideline range and the factors listed in Title 18, United States Code, Section 3553(a). The parties' agreement herein to any guideline sentencing factors constitutes proof of those factors sufficient to satisfy the applicable burden of proof. The Defendant also understands that if the Court accepts this Agreement, the Court is bound by the sentencing provisions in Paragraph 19.

18.    The Offices and the Defendant agree that a faithful application of the Sentencing Guidelines to determine the applicable fine range yields the following analysis:

a.    The 2018 U.S.S.G. are applicable to this matter.

b.    Offense Level. Based upon U.S.S.G. § 2B1.1, the total offense level is 39, calculated as follows:

| | | |
|---|---|---|
| (a)(1) | Base Offense Level | 7 |
| (b)(1)(N) | Loss more than $150M | +26 |
| (b)(2)(a) | More than 10 victims | +2 |
| (b)(2)(10) | Outside the United States/Sophisticated Means | +2 |
| (b)(17)(A) | $1M in gross receipts from a financial institution | +2 |
| **TOTAL** | | **39** |

c.    Base Fine. Based upon U.S.S.G. § 8C2.4(a)(3), the base fine is $208,000,000. Under U.S.S.G. § 8C2.4(a), the base fine is the greatest of the amount from the Offense Level Fine Table or the pecuniary loss or gain from the offense. Here, the pecuniary loss is the greatest and is $208,000,000.

15

d.      Culpability Score. Based upon U.S.S.G. § 8C2.5, the culpability score is 7, calculated as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(5) | 1,000 or more employees and high-level personnel | +4 |
| (g)(2) | Cooperation and Acceptance | -2 |
| **TOTAL** | | 7 |

Calculation of Fine Range:

| | |
|---|---|
| Base Fine (U.S.S.G. §§ 8C2.4(a), (e)) | $208,000,000 |
| Multipliers (U.S.S.G. § 8C2.6) | 1.4 (min)/2.8 (max) |
| Fine Range (U.S.S.G. § 8C2.7) | $291,200,000 (min)/ $582,400,000 (max) |

19.    Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the Offices and the Defendant agree that the following represents the appropriate disposition of the case:

a.      Disposition. Pursuant to Fed. R. Crim, P. 11(c)(l)(C), the Offices and the Defendant agree that the appropriate disposition of this case is as set forth above, and agree to recommend jointly that the Court, at a hearing to be scheduled at an agreed upon time, impose a sentence requiring the Defendant to pay a $500,000 criminal fine within ten business days of the sentencing hearing (the "Recommended Sentence"). Specifically, the parties agree that the Recommended Sentence is appropriate in light of the Parent Company's DPA, which relates to the same conduct to which the Defendant is pleading guilty. Pursuant to the DPA, the Parent Company and the Offices agreed, based on the application of the USSG to the misconduct, that the appropriate total criminal penalty is $247,520,000 (the "Total Criminal Penalty"), $500,000

of which will be paid as a criminal fine by the Defendant pursuant to this Agreement, and the appropriate forfeiture is $10,344,865 (the "Forfeiture Amount"). The Total Criminal Penalty reflects a 15 percent discount off of the bottom of the applicable Sentencing Guidelines fine range. The Parent Company and the Offices further agreed that the Parent Company will pay $175,068,000 to the United States Treasury within ten business days of the sentencing hearing in connection with this Agreement. The Offices agree to credit the remaining amount of the Total Criminal Penalty against the amount the Parent Company pays to the SEC, up to a maximum of $47,200,000, in connection with the parallel resolution entered into by the Parent Company and the SEC and against the amount the amount the Parent Company pays to the FCA, up to a maximum of $24,752,000, in connection with the parallel resolution entered into by the Parent Company and the FCA. The Parent Company's payment obligation under the DPA will be complete upon the payment of $175,568,000, $500,000 of which the Defendant will pay as a criminal fine pursuant to this Agreement, so long as the Parent Company pays the remaining amount of the Total Criminal Penalty to the SEC and the FCA by the end of one year from the beginning of the Term. Should any amount of such payment to the SEC and the FCA not be made by the end of one year from the beginning of the Term, or be returned to the Parent Company or any affiliated entity for any reason, the remaining balance of the Total Criminal Penalty will be paid to the United States Treasury. The Offices further agree to credit the Forfeiture Amount against any amount equal or greater to the Forfeiture Amount that the Company pays as disgorgement to the SEC in connection with the parallel resolution entered into by the Parent Company and the SEC, if paid within one year from the beginning of the Term. Should the Parent Company not pay the full Forfeiture Amount to the SEC by one year from the

beginning of the Term, or should all or a portion of the Forfeiture Amount be returned to the Parent Company or any affiliated entity for any reason, the Parent Company agrees to forfeit the remaining balance of the Forfeiture Amount.

b.   The Defendant shall not seek or accept directly or indirectly reimbursement or indemnification from any source, other than the Parent Company, with regard to the fine, penalty, or forfeiture amounts that the Defendant or the Parent Company pays pursuant to the Agreement, the DPA or any other agreement entered into with an enforcement authority or regulator concerning the facts set forth in the Statement of Facts. The Defendant further acknowledges that no tax deduction may be sought in connection with the payment of any part of this fine.

c.   Mandatory Special Assessment. The Defendant shall pay to the Clerk of the Court for the United States District Court for the Eastern District of New York within 10 days of the date of sentencing the mandatory special assessment of $400.

d.   Restitution. The Defendant and the Parent Company shall be jointly and severally liable for restitution in the full amount of each victim's losses as determined by the Court at sentencing as restitution is mandatory pursuant to 18 U.S.C. §§ 3663A and 3664. The Defendant agrees to pay restitution in the full amount as determined by the Court. The parties jointly recommend that the Court use an event study methodology to determine the amount of victim-investor losses directly and proximately caused by the fraud scheme that is set out in the Information and the Statement of Facts (the "Recommended Methodology"). Under the Recommended Methodology, the parties agree that investors who held the EMATUM Securities on April 15, 2016 and/or on April 29, 2016 may be entitled to restitution because disclosures that

18

partially revealed the fraud scheme and/or materialization of the risk on those approximate dates (the "Events") resulted in a statistically significant decline in value of the EMATUM Securities (the "Proximately Harmed Investors").  The parties agree that (1) the drop in value of the EMATUM Securities attributable to the Events was directly and proximately caused by the fraud scheme; (2) the Recommended Methodology fairly and reasonably estimates restitution in this case; and (3) the Recommended Methodology will not complicate or prolong sentencing unduly. The parties agree to recommend that the Proximately Harmed Investors receive restitution in an amount equal to the price decline of the EMATUM Securities attributable to the Events under the Recommended Methodology, multiplied by the number of EMATUM Securities the Proximately Harmed Investor held, minus any gains the Proximately Harmed Investor realized from any subsequent sale of the EMATUM Securities (the "Proximately Harmed Investor Losses").  The parties agree that the Proximately Harmed Investor Losses calculated pursuant to the Recommended Methodology are not subject to reductions for gains Proximately Harmed Investors may have obtained through hedging strategies or coupons received from the EMATUM Securities.  Should the Court reject the Recommended Methodology in determining restitution: (1) the Defendant and the Offices preserve all arguments as to restitution; and (2) all other provisions of the Plea Agreement and the Deferred Prosecution Agreement remain valid and enforceable.

20.     This Agreement is presented to the Court pursuant to Fed. R. Crim. P. 11(c)(1)(C).  The Defendant understands that, if the Court rejects this Agreement, the Court must: (a) inform the parties that the Court rejects the Agreement; (b) advise the Defendant's counsel that the Court is not required to follow the Agreement and afford the Defendant the

19

opportunity to withdraw its plea; and (c) advise the Defendant that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the Defendant than the Agreement contemplated. The Defendant further understands that if the Court refuses to accept any provision of this Agreement, with the exception of the Recommended Methodology for restitution outlined in paragraph 19(d), neither party shall be bound by the provisions of the Agreement. The parties agree that should the Court reject the Recommended Methodology for restitution outlined in paragraph 19(d), but accept the remainder of this Agreement, the parties shall be bound by the remaining provisions of the Agreement.

21.     The Defendant and the Offices waive the preparation of a Pre-Sentence Investigation Report ("PSR") and intend to ask the Court to set a sentencing hearing in the absence of a PSR at a date in the future. The Defendant understands that the decision whether to proceed with the sentencing proceeding without a PSR is exclusively that of the Court. In the event the Court directs the preparation of a PSR, the Offices will fully inform the preparer of the PSR and the Court of the facts and law related to the Defendant's case.

BREACH OF AGREEMENT

22.     If the Defendant (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information; (c) fails to cooperate as set forth in Paragraphs 9 and 10 of this Agreement; (d) commits any acts that, had they occurred within the jurisdictional reach of the United States, would constitute a violation of U.S. federal law; or (e) otherwise fails specifically to perform or to fulfill completely each of the Defendant's obligations under the Agreement, regardless of whether the Offices become aware of such a breach after the Term, the Defendant shall thereafter be subject to

20

prosecution for any federal criminal violation of which the Offices have knowledge, which may be pursued by the Offices or any other United States Attorney's Office. Determination of whether the Defendant has breached the Agreement and whether to pursue prosecution of the Defendant shall be in the Offices' sole discretion. Any such prosecution may be premised on information provided by the Defendant, the Parent Company, or their personnel. Any such prosecution relating to the conduct described in the Information and the attached Statement of Facts or relating to conduct known to the Offices prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Defendant, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term of the Agreement plus one year. Thus, by signing this Agreement, the Defendant agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year. The Defendant gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such prosecution or action, except to the extent that such defenses existed as of the date of the signing of this Agreement. In addition, the Defendant agrees that the statute of limitations as to any violation of federal law that occurs during the term of the cooperation obligations provided for in Paragraphs 9 and 10 of the Agreement will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Offices are made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

23.     In the event the Offices determine that the Defendant has breached this Agreement, the Offices agree to provide the Defendant with written notice of such breach prior to instituting any prosecution resulting from such breach.  Within 30 days of receipt of such notice, the Defendant shall have the opportunity to respond to the Offices in writing to explain the nature and circumstances of such breach, as well as the actions the Defendant has taken to address and remediate the situation, which explanation the Offices shall consider in determining whether to pursue prosecution of the Defendant.

24.     In the event that the Offices determine that the Defendant has breached this Agreement: (a) the Information and all statements made by or on behalf of the Defendant or the Parent Company to the Offices or to the Court, including the Statement of Facts, and any testimony given by the Defendant before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Offices against the Defendant; and (b) the Defendant shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Defendant or the Parent Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible.  The decision whether conduct or statements of any current director, officer or employee, or any person acting on behalf of, or at the direction of, the Defendant, will be imputed to the Defendant for the purpose of determining whether the Defendant has violated any provision of this Agreement shall be in the sole discretion of the Offices.

25.    The Defendant acknowledges that the Offices have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Defendant breaches this Agreement and this matter proceeds to judgment. The Defendant further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

<u>PUBLIC STATEMENTS BY THE DEFENDANT</u>

26.    The Defendant expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Defendant make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Defendant set forth above or the facts described in the Information and the Statement of Facts. Any such contradictory statement shall, subject to cure rights of the Defendant described below, constitute a breach of this Agreement, and the Defendant thereafter shall be subject to prosecution as set forth in Paragraphs 22 to 25 of this Agreement. The decision whether any public statement by any such person contradicting a fact contained in the Information or the Statement of Facts will be imputed to the Defendant for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Offices. If the Offices determine that a public statement by any such person contradicts in whole or in part a statement contained in the Information or the Statement of Facts, the Offices shall so notify the Defendant, and the Defendant may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification. The Defendant shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Information and the Statement of Facts provided that such defenses and

claims do not contradict, in whole or in part, a statement contained in the Information or the Statement of Facts. This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Defendant in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Defendant.

27.     The Defendant agrees that if it or any of its direct or indirect subsidiaries or affiliates over which the Defendant exercises control issues a press release or holds any press conference in connection with this Agreement, the Defendant shall first consult the Offices to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Offices and the Defendant; and (b) whether the Offices have any objection to the release or statement.

[INTENTIONALLY LEFT BLANK]

## COMPLETE AGREEMENT

28.     This document, including its attachments, states the full extent of the Agreement between the parties.  There are no other promises or agreements, express or implied.  Any modification of this Agreement shall be valid only if set forth in writing in a supplemental or revised plea agreement signed by all parties.

AGREED:

**FOR CREDIT SUISSE SECURITIES (EUROPE) LIMITED:**

Date: 10/19/2021                    By: _____

Alan Reifenberg
Authorized Representative
Credit Suisse Securities (Europe) Limited

Date: 10/19/2021                    By: _____

Matthew Herrington
Tom Best
Paul Hastings LLP
Counsel for Credit Suisse Securities (Europe) Limited

Date: 10/19/2021                    By: _____

Mark Filip
Brigham Cannon
Kirkland & Ellis LLP
Counsel for Credit Suisse Securities (Europe) Limited

**FOR THE U.S. DEPARTMENT OF JUSTICE:**

BREON PEACE
United States Attorney
Eastern District of New York

DEBORAH L. CONNOR
Chief, Money Laundering and Asset
Recovery Section
Criminal Division
U.S. Department of Justice

Hiral D. Mehta
Assistant U.S. Attorney

Margaret A. Moeser
Trial Attorney

JOSEPH BEEMSTERBOER
Acting Chief, Fraud Section
Criminal Division
U.S. Department of Justice

David Fuhr
Katherine Nielsen
Trial Attorneys

Date: 10/19/21

26

## COMPANY OFFICER'S CERTIFICATE

I have read the plea agreement between Credit Suisse Securities (Europe) Limited (the "Defendant") and the United States of America, by and through the United States Department of Justice, Criminal Division, Money Laundering & Asset Recovery Section and Fraud Section, and the United States Attorney's Office for the Eastern District of New York (the "Agreement") and carefully reviewed every part of it with outside counsel for the Defendant. I understand the terms of the Agreement and voluntarily agree, on behalf of the Defendant, to each of its terms. Before signing the Agreement, I consulted outside counsel for the Defendant. Counsel fully advised me of the rights of the Defendant, of possible defenses, of the United States Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of the Agreement with the Board of Directors. I have advised and caused outside counsel for the Defendant to advise the Board of Directors fully of the rights of the Defendant, of possible defenses, of the United States Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in the Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing the Agreement on behalf of the Defendant, in any way to enter into the Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the

Global Head of Litigation and Investigations for the Defendant and that I have been duly authorized by the Defendant to execute the Agreement on behalf of the Defendant.

Date: _____10/19/2021_____

                              Credit Suisse Securities (Europe) Limited

                  By:       _____
                              Alan Reifenberg
                              Authorized Representative
                              Credit Suisse Securities (Europe) Limited

ii

## CERTIFICATE OF COUNSEL

I am counsel for Credit Suisse Securities (Europe) Limited (the "Defendant") in the matter covered by the plea agreement between the Defendant and the United States of America, by and through the Department of Justice, Criminal Division, Money Laundering and Asset Recovery Section and Fraud Section, and the United States Attorney's Office for the Eastern District of New York (the "Agreement"). In connection with such representation, I have examined relevant documents and have discussed the terms of the Agreement with the Board of Directors. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Defendant has been duly authorized to enter into the Agreement on behalf of the Defendant and that the Agreement has been duly and validly authorized, executed, and delivered on behalf of the Defendant and is a valid and binding obligation of the Defendant. Further, I have carefully reviewed the terms of the Agreement with the Board of Directors and the officers of the Defendant. I have fully advised them of the rights of the Defendant, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into the Agreement. To my knowledge, the decision of the Defendant to enter into the Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Counsel for Credit Suisse Securities (Europe) Limited:

Date: ___10/19/2021___          By: _____
                                     Matthew Herrington
                                     Tom Best
                                     Paul Hastings LLP

Date: ___10/19/2021___          By: _____
                                     Mark Filip
                                     Brigham Cannon
                                     Kirkland & Ellis LLP

ATTACHMENT A
**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Money Laundering and Asset Recovery Section and Fraud Section, and the United States Attorney's Office for the Eastern District of New York (collectively, the "United States"), and the defendant Credit Suisse Group AG (together with its wholly-owned subsidiaries and affiliated entities, "Credit Suisse"). Credit Suisse hereby agrees and stipulates that the following facts and conclusions of U.S. law are true and accurate. Certain of the facts herein are based on information obtained from third parties by the United States through its investigation and described to Credit Suisse. Credit Suisse admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees and agents as set forth below. Should the United States pursue the prosecution that is deferred by this Agreement, Credit Suisse agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts took place in or about and between 2013 and March 2017 (the "relevant time period"), unless otherwise noted, and Credit Suisse agrees that these facts establish beyond a reasonable doubt the charges set forth in the criminal Information attached to the Agreement.

## The Defendant Credit Suisse and Other Entities

1.     Credit Suisse Group AG was a global investment banking, securities and investment management firm incorporated and headquartered in Zurich, Switzerland. It conducted its activities primarily through various subsidiaries and affiliates, including subsidiaries in London, United Kingdom and New York, New York.

2.     Credit Suisse Securities (Europe) Limited ("CSSEL") was a wholly-owned subsidiary of Credit Suisse headquartered in London, United Kingdom and acted as a Joint Lead

A-1

Manager underwriting the issuance of $500 million in loan participation notes ("LPNs") to partially finance an $850 million loan for a tuna fishing project in Mozambique in 2013 and acted as Joint Dealer Manager in the exchange of those LPNs for a sovereign bond ("EMATUM Exchange") (collectively, the "EMATUM Securities") in 2016.

### Credit Suisse Bankers

3. Andrew Pearse was a citizen of New Zealand and was, until approximately September 2013, an employee of CSSEL and agent of Credit Suisse Group AG, and also a Managing Director and authorized signatory of CSSEL within the Global Financing Group ("GFG") based in London.

4. Surjan Singh was a citizen of the United Kingdom and was, until approximately February 2017, an employee of CSSEL and agent of Credit Suisse Group AG, and also a Managing Director and authorized signatory of CSSEL within the GFG.

5. Detelina Subeva was a citizen of Bulgaria and was, until approximately July 2013, an employee of CSSEL and agent of Credit Suisse Group AG, and also a Vice President of CSSEL, within the GFG.

### Other Relevant Entities

6. ProIndicus S.A. ("ProIndicus") was a company owned, controlled and overseen by the Government of Mozambique. ProIndicus was created to undertake a project to create a state-owned coastal surveillance and protection plan for Mozambique.

7. Empresa Moçambicana de Atum, S.A. ("EMATUM") was a company owned, controlled and overseen by the Government of Mozambique. EMATUM was created to undertake a project to create a state-owned tuna fishing company for Mozambique.

A-2

8. Mozambique Asset Management ("MAM") was a company owned, controlled and overseen by the Government of Mozambique. MAM was created to build and maintain shipyards.

9. Privinvest Group was a holding company based in Abu Dhabi, United Arab Emirates ("UAE") consisting of numerous subsidiaries (collectively, "Privinvest"), including certain Palomar entities (collectively, "Palomar"). Privinvest was engaged in shipbuilding of various types of vessels. The Government of Mozambique retained Privinvest as the sole contractor for the ProIndicus, EMATUM and MAM projects, and Palomar as its adviser on the EMATUM Exchange.

## Other Relevant Individuals

10. Manuel Chang was a citizen of Mozambique and Mozambique's Minister of Finance.

11. Antonio Do Rosario was a citizen of Mozambique and an official in Mozambique's governmental state intelligence and security service, known as Servico de Informacoes e Seguranca do Estado, which, together with other Mozambican government agencies, was an owner of ProIndicus and EMATUM. Do Rosario served as the executive director of ProIndicus and the Chief Executive Officer of EMATUM.

12. Teofilo Nhangumele was a citizen of Mozambique acting in an official capacity for and on behalf of the Office of the President of Mozambique.

13. Jean Boustani was a citizen of Lebanon and the lead salesman and negotiator for Privinvest. Boustani also participated in the management of Palomar.

A-3

14.    Privinvest Co-Conspirator 1[1] was a citizen of Lebanon and France and a senior executive of Privinvest.

### Relevant Terms and Definitions

15.    A "loan participation note" or "LPN" was a fixed-income security that provided the holder with a pro-rata interest in the borrower's payment of interest and repayment of principal on a loan.

16.    A "Eurobond" was an international bond sold in a currency other than the currency of the borrower.

17.    A "security" was, among other things, any note, stock, bond, debenture, evidence of indebtedness, investment contract or participation in any profit-sharing agreement.

### Overview of the Fraudulent Scheme

18.    Credit Suisse and its co-conspirators used U.S. wires and the U.S. financial system to defraud U.S. and international investors in the EMATUM Securities. The co-conspirators used international and interstate wires to, from and through the United States, including wires through the Eastern District of New York, to transmit false and misleading statements to investors in the EMATUM Securities, transfer proceeds obtained from those investors and pay kickbacks to Credit Suisse bankers and bribes to Mozambican government officials.

19.    Through a series of financial transactions during the relevant time period, three Mozambican government-owned entities—ProIndicus, EMATUM and MAM—borrowed in excess of $2 billion through loans to fund three maritime projects guaranteed by the Mozambican government. Credit Suisse was the primary arranger on the ProIndicus and EMATUM loans and

---

[1] The identities of all anonymized individuals and entities are known to the United States and Credit Suisse.

A-4

sold the loans to investors worldwide.  Credit Suisse also arranged the EMATUM Exchange. Another international Bank ("Investment Bank 1") arranged the MAM financing, which Credit Suisse was aware of but in which it played no role.  Credit Suisse, through its employees and agents, including Pearse, Singh, Subeva and others, among other things, knowingly and willfully conspired with others to defraud investors and potential investors in the EMATUM Securities through numerous material misrepresentations and omissions relating to, among other things: (i) the use of loan proceeds; (ii) kickback payments to Credit Suisse bankers and the risk of bribes to Mozambican officials; and (iii) the existence and maturity dates of debt owed by Mozambique, including the ProIndicus and MAM loans.

20.    From the proceeds of the ProIndicus and EMATUM loans, Privinvest paid bribes totaling approximately $150 million to senior Mozambican government officials, including Chang and Do Rosario, and also paid kickbacks of approximately $50 million to Pearse and Singh.

## Background

21.    In or about November 2011, Mozambican government officials agreed to hire Privinvest as the sole contractor for a maritime project—ultimately called ProIndicus— designed to protect, surveil and exploit Mozambique's long coastline, based on Privinvest's agreement to pay bribes to Mozambican government officials to secure the project.  In numerous email communications, representatives of Privinvest and Mozambique openly discussed the payment of bribes.  For example:

a.    On or about November 11, 2011, Nhangumele explained to Boustani that to "secure" the approval of the President of Mozambique for the ProIndicus project, a payment had to be agreed upon "well in advance," which could be "built in the project, and recovered."  In his response to the email on the same day, Boustani praised Nhangumele for "talking openly" and

A-5

explained that Privinvest did not pay "success fees" before signing the project contract.

        b.     On or about November 14, 2011, Nhangumele responded that he "agree[d] in principle" and that there would be "other players whose interest[s] will have to be looked after e.g. ministry of defense, ministry of interior, air force, etc." Nhangumele further wrote that in "democratic governments like ours people come and go, and everyone involved will want to have his/her share of the deal while in office, because once out of the office it will be difficult."

        c.     On or about December 28, 2011, Nhangumele and Boustani agreed by email that Privinvest would pay $50 million in bribes to Mozambican government officials to secure the project. Boustani explained to Nhangumele that he needed "a % or figure" and that the proposal for the project would be addressed to the President of Mozambique after the figures were agreed upon. Nhangumele replied, "Fine brother. I have consulted and please put 50 million chickens."

        d.     On or about the same day, December 28, 2011, Boustani forwarded Nhangumele's email to Privinvest associates and confirmed "50M for them and 12M for [Privinvest consultant] (5%)==>total of 62M on top."

        22.     In or about and between December 2011 and January 2012, Boustani met with Nhangumele and other co-conspirators at Privinvest's offices in the UAE to finalize the bribes and move forward with the ProIndicus project. Nhangumele made clear to Boustani that Mozambique would need to obtain financing for the ProIndicus project.

        23.     In or about February 2012, Privinvest approached two Credit Suisse coverage bankers ("Credit Suisse Managing Director 1" and "Credit Suisse Director 1"), about arranging financing for the ProIndicus project. Over the course of several meetings with Privinvest and Mozambican government officials, Credit Suisse Managing Director 1, Credit Suisse

A-6

Director 1 and Pearse advised that Credit Suisse could arrange a loan only if the Government of Mozambique was either the debtor or guaranteed the loan. The parties agreed that Mozambique would guarantee the loan, but Credit Suisse would pay the proceeds of the loan directly to Privinvest.

24.    Credit Suisse undertook an enhanced due diligence process, conferring internally and using a diligence firm ("Firm 1") to review Privinvest and the proposed directors of ProIndicus. That due diligence process brought to light significant corruption and bribery concerns related to Privinvest, including that Privinvest Co-Conspirator 1 was "heavily involved in corrupt practices" and "viewed kickbacks as an acceptable part of his everyday business strategy." For example:

a.    On or about March 12, 2012, Credit Suisse Managing Director 1 sent an email to Singh and Credit Suisse Director 1 and advised them that Credit Suisse had previously designated Privinvest Co-Conspirator 1 an "undesirable client," though he was no longer designated as such in March 2012.

b.    On or about November 19, 2012, Pearse sent an email to Singh and Credit Suisse Managing Director 1 and Credit Suisse Director 1 and advised them that a Credit Suisse senior executive "said no" to the combination of Privinvest Co-Conspirator 1 and Mozambique. Given these concerns, Pearse proposed that Credit Suisse would need to "structure" Privinvest Co-Conspirator 1 "out of the picture."

c.    On or about March 20, 2013, Firm 1 provided Credit Suisse with an extensive due diligence report on Privinvest and Privinvest Co-Conspirator 1 (the "Firm 1 Report"). The Firm 1 Report, which was reviewed by multiple executives at Credit Suisse including compliance, risk and other functions, described Privinvest Co-Conspirator 1 as a "master of

A-7

kickbacks" and included other findings, such as:

   i.      "All sources we spoke to about [Privinvest Co-Conspirator 1] were confident of his past and continued involvement in offering and receiving bribes and kickbacks" and "without exception … have raised concerns about the integrity of [Privinvest Co-Conspirator 1's] business practices," and that "[Privinvest Co-Conspirator 1]] was heavily involved in corrupt practices."

   ii.     "A senior banking source close to a Lebanese commercial bank that previously dealt with [Privinvest Co-Conspirator 1] and the Privinvest Group of companies told [Firm 1]: '[Privinvest Co-Conspirator 1] is a first-class deal maker and an expert in kickbacks, bribery and corruption.'" According to the senior banking source, the commercial bank eventually terminated its relationship with Privinvest.

   iii.    Another source said Privinvest Co-Conspirator 1 was someone who "ethically, … really doesn't care and will do whatever is necessary to win a contract. Ethics are at the bottom of his list!" "[T]rusted sources in Lebanon and the UAE" who knew Privinvest Co-Conspirator 1 and had dealt with Privinvest directly stated that Privinvest Co-Conspirator 1 was "alleged to be heavily involved in corrupt practices[,]" with one source describing Privinvest Co-Conspirator 1 as a "dangerous man" who would "stop at nothing to secure a contract."

   iv.     "Since the creation of [Privinvest subsidiary] in Abu Dhabi, [Privinvest Co-Conspirator 1] appears to be conducting his business in a much more classical way, more in compliance with the rules of ethics." The source confirmed that the UAE authorities were aware of the negative reporting around [Privinvest Co-Conspirator 1]'s alleged involvement in corruption, but were confident that "this is not the case at [Privinvest subsidiary]."

A-8

25.    Credit Suisse moved forward with the ProIndicus financing. In or about February 2013, Pearse met with Boustani in Mozambique to finalize the ProIndicus transaction, during which time they secretly agreed that Privinvest would pay Pearse a kickback of $5.5 million in exchange for Pearse's efforts to reduce the fees payable to Credit Suisse in connection with securing the ProIndicus financing.

26.    In or about March 2013, following review by Credit Suisse's compliance and risk management control functions, Credit Suisse finalized its agreement to arrange a $372 million syndicated loan to ProIndicus, guaranteed by the Government of Mozambique. Singh signed the loan agreement on behalf of Credit Suisse, Do Rosario co-signed the loan agreement in his capacity as executive director on behalf of ProIndicus, and Chang signed the government guarantee in his capacity as Minister of Finance on behalf of Mozambique. ProIndicus was a private loan that was not disclosed publicly.

### The EMATUM Loan

27.    Within months of finalizing the ProIndicus loan, Credit Suisse agreed to raise $500 million—Investment Bank 1 later raised an additional $350 million—in financing for EMATUM to establish a tuna fishing company. EMATUM had hired Privinvest as sole contractor to supply the tuna fishing boats, an operations center and related training for the project. Credit Suisse agreed to send the proceeds it raised from investors directly to Privinvest, as distribution of funds directly into Mozambique was considered a higher corruption risk than Privinvest.

### *The Co-Conspirators "Maximize" the EMATUM Loan*

28.    Credit Suisse, through its employees and agents, and together with Privinvest, increased the size of the EMATUM loan from an originally planned $250 million to $850 million. In or about March 2013, when Boustani and Pearse first discussed the EMATUM

A-9

project, Boustani suggested to Pearse that Credit Suisse raise $250 million for the project. By approximately July 2013, however, Boustani and Pearse and other co-conspirators substantially increased the EMATUM loan amount by inflating the size of the project and the price of Privinvest's goods and services. This allowed Privinvest to pay larger kickbacks to Pearse and Singh and larger bribes to Mozambican officials and others. The larger loan also benefited the bank by increasing the fees Credit Suisse ultimately earned arranging the transaction. EMATUM, Privinvest and Credit Suisse agreed on an LPN structure and marketed the LPN to the international bond market, including to investors in the United States.

29. Specifically, on or about July 4, 2013, Boustani confirmed in an email to Pearse on his personal email that Do Rosario, EMATUM's Chief Executive Officer, would "go ahead in all suggestion[s] needed in order to maximize the funding size" of the EMATUM loan to Mozambique, including the use of the "bond market." In response, Pearse wrote an email to Boustani, copying Subeva on a personal email account, in which Pearse committed to a plan for "maximising funding" for the EMATUM project.

30. By on or about July 21, 2013, Pearse, Subeva and Boustani created a "package" of 24 fishing boats to justify an EMATUM project price of $800 million, which was subsequently finalized as 27 fishing boats and related training services and operations for $850 million.

31. In or about July 2013, Pearse announced he was leaving Credit Suisse. Pearse continued to be employed by Credit Suisse, on gardening leave, until on or about September 13, 2013. In the interim, Pearse had secretly begun working for Palomar, a Privinvest subsidiary; he continued working at Palomar after leaving Credit Suisse. Credit Suisse placed Subeva on gardening leave on or about July 22, 2013, and terminated her for redundancy on or

A-10

about August 21, 2013. Subeva had also begun working for Palomar secretly before being placed

on gardening leave and terminated from Credit Suisse, and continued working at Palomar after her

termination from Credit Suisse.

32. Following Pearse's departure from Credit Suisse, Singh became the lead

banker for Credit Suisse on the EMATUM loan. In that role, Singh understood that Privinvest

would pay him and Pearse millions of dollars in kickbacks in exchange for facilitating Credit

Suisse's approval of the EMATUM loan and LPN financing. Singh remained a managing director

at Credit Suisse until on or about March 2017.

### *Credit Suisse Approves the EMATUM Loan*

33. In or about August 2013, Credit Suisse employees in the GFG working

together with the Credit Risk Management function, prepared a Credit Risk Management

Memorandum to seek internal credit department approval of the EMATUM deal. The

memorandum stated that "certain past allegations against" Privinvest Co-Conspirator 1, including a

corruption-related indictment in France that was ultimately dismissed, "precipitated Enhanced Due

Diligence, which was performed in March 2013 related to a previous CS financing [ProIndicus]."

34. On or about August 30, 2013, Credit Suisse agreed to make up to $850

million in loans guaranteed by Mozambique to EMATUM to fund EMATUM's tuna fishing

project; Credit Suisse acted as the facility agent and arranger of the loan and ultimately only funded

$500 million. In addition to Credit Risk Management, the European Investment Banking

Committee, Reputational Risk, and the Compliance and Anti-Money Laundering functions

considered the transaction and agreed to allow the EMATUM transaction to go forward.

35. The EMATUM loan agreement included the following representations and

requirements:

A-11

a.      "Section 3.1: Purpose" represented that "[t]he Borrower [EMATUM] shall apply all amounts borrowed by it under the Facility towards the financing of the Project and the general corporate purposes of the Borrower." The loan agreement defined the Project as "the purchase of fishing infrastructure, comprising of 27 vessels, an operations centre [sic] and related training."

b.      "Section 19.2: Compliance with laws" represented that "[t]he Borrower shall comply in all respects: (a) with all Anti-Corruption Laws and will not engage in any other conduct that would constitute a Corrupt Act (including but not limited to making or accepting, or directing any other person to make or accept, any offer, payment, promise to pay, or authorizing the payment of acceptance of any money or any gift or anything of value, directly or indirectly, to or for the use or benefit of any official or employee of any government or any political party or candidate for political office if any part of such conduct would violate or create liability for it or any person under any applicable law relating to bribes, kickbacks, or similar corrupt practices)." The loan agreement defined a "Corrupt Act" as including but not limited to "payments to improperly influence any person, including government officials, and any other violation of anti-bribery or anti-corruption laws including the U.S. Foreign Corrupt Practices Act."

c.      "Section 26.1: Payments to the Facility Agent" specified that all payments by the borrower or the lenders would be paid to Credit Suisse's bank account at a bank in New York, New York ("New York Bank 1").

36.      Singh signed the EMATUM loan agreement on behalf of Credit Suisse as Arranger and Facility Agent, and Do Rosario signed on behalf of EMATUM, the borrower. Chang signed the government guarantee on behalf of Mozambique.

A-12

37.    On or about September 5, 2013, Credit Suisse arranged the sale of $500 million of EMATUM LPNs to investors. The LPNs were to mature in 2020 and had a 6.305% coupon.

38.    Having arranged the sale of the LPNs, on or about September 11, 2013, Credit Suisse loaned approximately $500 million to EMATUM to finance the EMATUM project, sending the funds less Credit Suisse's fees directly to a Privinvest subsidiary through Credit Suisse's account at New York Bank 1. On or about October 5, 2013, Investment Bank 1 arranged the sale of $350 million of EMATUM LPNs to investors in the United States and elsewhere. On or about October 11, 2013, Investment Bank 1 loaned an additional approximately $350 million to EMATUM. Credit Suisse, as the Facility Agent, sent the funds raised by Investment Bank 1 directly to a Privinvest subsidiary through Credit Suisse's account at New York Bank 1.

39.    After Credit Suisse transferred the funds raised to finance the EMATUM project to Privinvest, Privinvest secretly paid millions of dollars to three of the signatories on the EMATUM deal—Singh, Do Rosario and Chang.

### *Credit Suisse Makes False Representations Regarding the EMATUM Loan*

40.    Credit Suisse approved the EMATUM loan even though its earlier due diligence process had identified significant risks of bribery and the size of the project had expanded greatly without apparent justification. Credit Suisse, through Pearse, Singh, and Subeva knew that Privinvest had paid kickbacks to Pearse in connection with the ProIndicus transaction, and would pay further kickbacks to Pearse and Singh in connection with the EMATUM loan.

41.    Credit Suisse funded its portion of the EMATUM loan by selling LPNs to global investors. By email and other electronic means using wires to, from, and through the United States, Credit Suisse sent potential investors materials that included the EMATUM loan agreement

A-13

and marketing materials such as the offering circular (the "LPN Investor Documents"). The LPN Investor Documents represented that the loan proceeds would be used exclusively to fund the EMATUM project, and that none of the proceeds would be used to pay bribes or kickbacks.

42. For example, on or about September 3, 2013, Credit Suisse sent a preliminary offering circular ("Preliminary OC") regarding the EMATUM LPNs from its New York offices to prospective investors using interstate and international wires. The Preliminary OC stated: "The proceeds from the Loan will be used by the Borrower towards the financing of the purchase of fishing infrastructure, comprising of 27 vessels, an operations center and related training and for the general corporate purposes of the Borrower." The final offering circular sent to prospective investors contained the same representations as the Preliminary OC.

43. When it made these statements, Credit Suisse knew they were false. Credit Suisse issued the EMATUM loan even though Singh and Pearse knew that they had received illegal kickbacks and would receive further kickbacks from the loan proceeds, and Credit Suisse was aware of the risk that funds from the EMATUM loan would be diverted to bribes. For example, (1) Pearse and Singh knew that they would receive millions of dollars in illegal kickback payments from Privinvest in connection with the EMATUM loan while employed by Credit Suisse; (2) Firm 1 had expressly warned Credit Suisse about Privinvest and Privinvest Co-Conspirator 1's history of "corruption and bribery"; and (3) a senior Credit Suisse executive had previously said "no" to Pearse to the combination of Privinvest Co-Conspirator 1 and Mozambique in November 2012.

44. Investors purchased the EMATUM LPNs in reliance on the representations in the EMATUM loan agreement and LPN offering circulars. Despite projections that EMATUM would generate annual fishing revenue of approximately $224 million by December 2016, it

A-14

generated minimal revenue and, as of approximately late 2017, had conducted very little fishing operations. EMATUM defaulted on its financing payment due on or about January 18, 2017.

### The EMATUM Exchange

45.     In or about 2015, Credit Suisse became aware that EMATUM had encountered problems servicing the $850 million of EMATUM LPNs, which were set to mature in 2020, raising the risk of default. EMATUM and Mozambique approached Credit Suisse to arrange a transaction that would exchange the EMATUM LPNs for government-issued Eurobonds that would mature approximately three years later, in 2023, and that had a 10.5% coupon, through an exchange process referred to as the EMATUM Exchange. This exchange would delay loan repayment to investors, improve Mozambique's ability to service its debts, and avoid default.

46.     Numerous senior Credit Suisse employees worked on the EMATUM Exchange, including Singh, though he did not lead the transaction.

### *Credit Suisse's Knowledge of Misuse of EMATUM Loan Proceeds*

47.     After the LPNs were issued, Credit Suisse became aware that the EMATUM project had generated minimal revenue in its first years of operation, making it likely that EMATUM would not be able to meet the repayment schedule provided for in the LPNs. In or about July 2015, EMATUM and Mozambique asked Credit Suisse to arrange the EMATUM Exchange. Credit Suisse agreed to ensure there was no default on the EMATUM loan repayment and to avoid increased scrutiny of Credit Suisse as the arranger of the original EMATUM LPNs.

48.     In an email on or about July 31, 2015, portions of which were memorialized in a Credit Suisse internal report, one senior Credit Suisse employee in the United Kingdom who covered reputational risk issues for the Europe, Middle East, and Africa region ("EMEA") raised concerns regarding "corruption allegations made in the press on the previous transaction (*'the*

A-15

*country's worst-ever corruption scandal')*" and asked whether Credit Suisse ever conducted an anti-money laundering review of "the proceeds of the previous CS involvement in financing to EMATUM in 2013 to check that they were spent on the assets they were provided for, given the press allegations of misappropriation and corruption."

49. In an email on or about August 3, 2015, a senior executive in EMEA Investment Banking stated to a senior colleague in EMEA Reputational Risk that if Credit Suisse "let another bank do the deal, we face a not insignificant risk that [Credit Suisse's] original transaction is positioned poorly and that it gives firepower to the opposition to say another bank has been brought in to clean up the trade." The senior executive opined that Credit Suisse was "in a much better place to control the situation and explain the positives of the action if we are leading the restructuring."

50. Credit Suisse also identified sensitivities related to the fact that former employees Pearse and Subeva were advising the Government of Mozambique on the EMATUM Exchange in their roles at Palomar. In an email on or about September 7, 2015 that was also memorialized in an internal Credit Suisse report to the Reputational Risk Committee, a Credit Suisse Director ("Credit Suisse Director 2") identified a third government-guaranteed loan of $540 million to MAM, an entity controlled by the Government of Mozambique, and expressly mentioned that Palomar was staffed with "former CS employees," noting that the involvement of the former employees was "unlikely to be disclosed in detail" because the loan to MAM was private but "should the specific details ever need to be publically [sic] disclosed … there may be sensitivity."

51. After arranging the EMATUM LPN financing, Credit Suisse employees raised concerns about potential misuse of EMATUM loan proceeds. On or about October 30, 2015,

A-16

employees reviewing the use of proceeds discussed by email that there were "too many significant disparities" related to the use of the EMATUM loan proceeds and as such "further investigation / explanation [was] required" before proceeding with the EMATUM Exchange. On or about November 2, 2015, a Credit Suisse executive in Reputational Risk EMEA explained in an email to the same employees that Reputational Risk approval for the EMATUM Exchange was contingent on "BACC [Bribery and Anti-Corruption Compliance] comfort on the UoP [use of proceeds]."

52.     To address the use of proceeds concerns in light of the risk that the LPN proceeds had been improperly diverted, Credit Suisse also engaged two independent industry experts to conduct valuations of the 27 boats and other items Privinvest sold to EMATUM.

53.     By early 2016, Credit Suisse knew that the expert valuations revealed a shortfall between the funds raised for the EMATUM loan and the assessed market value of the boats and accompanying infrastructure and training Privinvest sold to EMATUM.

54.     On or about February 10, 2016, a Credit Suisse employee ("Credit Suisse Employee 1") emailed Credit Suisse Director 2 and others and explained that the employees involved in coordinating the EMATUM Exchange "need[ed] to take a position/view on the valuation reports … and provide a narrative to back this view up." Credit Suisse Employee 1 went on to explain that "where gaps in the use of proceeds" were identified, Credit Suisse would need to "form an opinion of what has happened to those missing elements" before "any Rep[utational] Risk meeting took place" to approve the EMATUM Exchange. Credit Suisse Employee 1 specifically noted that Credit Suisse "would also need to consider whether there is a duty to disclose any of the findings" to investors.

55.     On or about February 11, 2016, Credit Suisse Director 2 sent an email to multiple Credit Suisse employees regarding the status of the EMATUM Exchange approval. Credit

Suisse Employee 1 indicated that issues that needed to be resolved included the results of the valuation reports—which were not "satisfactory" and raised "questions in terms of valuation shortfall"—and Mozambique's reluctance to disclose the ProIndicus loan in the offering circular for the EMATUM Exchange.

56.     On or about February 19, 2016, Credit Suisse Director 2 sent Singh and several Credit Suisse executives and senior employees an email attaching the two independent valuation reports and a chart summarizing the shortfall.  The independent valuation expert reports found that the fair market value of the 27 boats that Privinvest sold EMATUM was between $265 million and $394 million less than the EMATUM loan value.  Credit Suisse Employee 1 explained that the expert valuations included "the maximum value of all features of the contract including a value for IP/Technology Transfer" and that there was a "significant shortfall" between the value of the equipment and the funds Credit Suisse sent for the project, which was primarily to purchase the 27 boats.

57.     During calls on recorded phone lines maintained by Credit Suisse, Singh and Credit Suisse Director 2 discussed their concern that BACC would "close us down" and "prevent us [from] doing the bond [exchange]."  Credit Suisse Director 2 raised concerns with Singh that Credit Suisse might "cut ties" on the EMATUM Exchange based on the valuation because the "committee is going to demand we get more info as part of [due diligence]" and because "no one" could "qualify" the value of certain aspects of the EMATUM deal such as the "transfer of technology."  Credit Suisse Director 2 concluded that the EMATUM Exchange was "going to be ugly" and "explained that the EMATUM transaction was going to be f**king s**t."

58.     Reflecting Credit Suisse's concern about, among other things, reputational damage if it did not carry out the EMATUM Exchange, on or about March 1, 2016, a Credit Suisse

A-18

employee sent another Credit Suisse employee a draft document with redline changes requesting approval for the EMATUM Exchange. The document outlined the issues raised by the valuation reports and gave an update on media coverage. On the first page, the memo indicated that the EMATUM Exchange would, among other things, "protect our reputation." A later section of the memo, titled "Media Reporting," stated, "The reputational damage would be significant if CS wasn't involved in restructuring the deal and another bank was brought in instead." And the "EMATUM transaction has proved problematic from (i) a media perspective . . . and use of proceeds."

59. On or about March 3, 2016, Credit Suisse Director 2 forwarded notes of a discussion he had had with Do Rosario to other Credit Suisse executives and senior employees, several of whom were in the Reputational Risk function, as well as to Singh. The notes reflected that Credit Suisse Director 2 shared the results of Credit Suisse's expert valuations with Do Rosario, including the shortfall of hundreds of millions of dollars, after which Do Rosario asked the executive if Credit Suisse's due diligence "had focused on whether funds had been diverted by [Privinvest]." Credit Suisse Director 2 "explained that [Credit Suisse's] due diligence had focused on the Use of Proceeds." Credit Suisse Director 2 stated that Do Rosario explained that "he does not feel that [Privinvest] has taken advantage of EMATUM & that [Privinvest] has provided value overall."

60. On or about March 3, 2016, multiple Credit Suisse executives and senior employees participated in a Reputational Risk meeting regarding the EMATUM Exchange. The reputational risk approver raised concerns about the valuation shortfall, noting that a shortfall of $250 million was "difficult to understand." A compliance executive explained that Credit Suisse had been reviewing the valuation reports from a regulatory perspective and stated that Credit Suisse

A-19

had "an obligation to report if there [was] a reasonable suspicion of financial crime" which could lead to "potential issues" and a "formal referral under the [U.K.] Proceeds of Crime Act," but that compliance executive was also "reassured by the reaction from EMATUM." Credit Suisse Director 2 said Do Rosario had stated he was "concerned but not alarmed" regarding the external valuations. The same compliance executive advised that the corruption risk, which another employee noted Credit Suisse had reviewed in 2013, "did not appear to have crystallised" and so "on balance [the valuation shortfall] did not appear to pose a reasonable suspicion [of] financial crime that would require a filing."

61.    Relying on the "rationale presented by the business [team]," the Compliance Department's "confirmation of no objection," the condition that no new funds would be raised, and that assisting with the restructuring was economically the best outcome for current investors and Mozambique, the Reputational Risk approver approved the Exchange.

62.    On or about March 8, 2016, Credit Suisse circulated a Global Investment Banking Committee ("GIBC") memorandum internally for approval of the EMATUM Exchange. The GIBC memorandum explained that one risk of the EMATUM Exchange was that Credit Suisse's independent valuation of the EMATUM vessels "was lower than expected from amount raised by EMATUM" and noted that Credit Suisse sent the EMATUM loan proceeds directly to Privinvest.

63.    Despite the use of proceeds concerns raised by the significant valuation shortfall and other previously identified red flags, which underscored the risk that the EMATUM proceeds had been used for corruption and bribery, Credit Suisse approved the EMATUM Exchange.

A-20

*Credit Suisse's False Statements to EMATUM Securities Investors*

64.    On or about March 9, 2016, Credit Suisse and Investment Bank 1 publicly announced the EMATUM Exchange. To convince investors to exchange their EMATUM LPNs for Mozambique-issued bonds, Credit Suisse and Investment Bank 1 prepared documents about the EMATUM Exchange (the "Exchange Investor Documents") that were sent to investors, including in the United States, using interstate and international wires.

65.    These Exchange Investor Documents included false and misleading statements regarding the use of proceeds of the original EMATUM loan. Even though Credit Suisse, through Singh, was aware that Credit Suisse bankers had received kickbacks from the EMATUM loan proceeds, this was not disclosed to investors. Moreover, Credit Suisse did not disclose evidence of the risk that EMATUM LPN proceeds had been misappropriated, which it learned from, among other things, the due diligence processes at the time of the ProIndicus and EMATUM loan transactions and subsequent boat valuations. Credit Suisse did disclose that it had been "widely reported in the press that the proceeds of the [LPNs]" had been used in part to purchase defense equipment," and that "subsequent press reports [had] also called into question whether all of the proceeds of the [LPNs] were used for authorized or appropriate purposes. Credit Suisse, however, did not disclose any of the information Credit Suisse had about the significant shortfall between the price Privinvest charged EMATUM for the 27 boats and the fair market value of those boats.

66.    In addition, the Exchange Investor Documents failed to specifically disclose the ProIndicus or MAM loans or their maturity dates. Rather, the Exchange Investor Documents stated Credit Suisse had "engaged, and may in the future engage, in investment banking and/or commercial banking transactions with, and have performed and continue to perform services for the

A-21

Issuer and its affiliates in the ordinary course of business for which they have received and for which they will in the future receive, fees. … In particular, an affiliate of [CSSEL] has a lending relationship with a wholly-owned state entity whose obligations have the benefit of a guarantee from Mozambique." Credit Suisse knew that by agreeing to the EMATUM Exchange, which delayed the EMATUM loan repayment date, EMATUM LPN investors were also agreeing to be paid after any other investors in other Mozambique government loans that matured earlier, such as ProIndicus. Credit Suisse arranged the ProIndicus loan and was also an investor in the ProIndicus loan. As a result, by extending the EMATUM loan repayment date through the EMATUM Exchange, Credit Suisse would be repaid on its investment in the private ProIndicus loan before EMATUM Securities investors were repaid.

67.     Credit Suisse arranged a "road show" in New York and London so that Mozambican government officials, including Do Rosario, and others, including Credit Suisse employees, could meet with investors to convince them to approve the EMATUM Exchange. On or about and between March 14, 2016 and March 15, 2016, Credit Suisse employees and Mozambican government officials, including Do Rosario, traveled to New York and met with at least ten investors regarding the EMATUM Exchange. During this road show, Credit Suisse and Do Rosario did not inform investors of (1) the significant valuation shortfall and risk that loan proceeds were improperly diverted, including to bribes; (2) the existence or maturity dates of the ProIndicus and MAM loans; (3) that Mozambique had not disclosed its true level of debt to the ProIndicus and MAM loans to the International Monetary Fund ("IMF"); and (4) kickbacks paid to Credit Suisse bankers in connection with the EMATUM loan.

68.     Ratification of the EMATUM Exchange required approval of 81% of the LPN holders. Around the time of the road show for the EMATUM Exchange, Credit Suisse

A-22

personnel estimated that 39% of the EMATUM LPNs were held in the United States. By no later than March 16, 2016, Credit Suisse determined that a sufficient number of EMATUM LPN holders had agreed to the EMATUM Exchange. On or about March 17, 2016, an updated EMATUM Exchange announcement was distributed to EMATUM LPN holders by wire indicating, among other things, interest rates for the new securities and an updated early exchange deadline.

69.     By on or about March 23, 2016, the early deadline, Credit Suisse determined that 98% of the EMATUM LPN holders had voted on the EMATUM Exchange, with approximately 86% of EMATUM LPN holders consenting to the EMATUM Exchange based upon the co-conspirators' false and misleading information about the EMATUM Exchange.

70.     On or about April 6, 2016, the EMATUM Exchange settled, resulting in the exchange of the EMATUM LPNs for Eurobonds on that same day.

71.     Aspects of Credit Suisse's fraudulent conduct were revealed beginning in April 2016, causing the price of the EMATUM Securities to drop and resulting in losses to investors. For example, on or about April 15, 2016, the IMF announced that it was halting aid to Mozambique after discovering that Mozambique had not disclosed debt of $1 billion related to the ProIndicus and MAM projects. On or about April 29, 2016, Fitch Ratings Ltd. downgraded Mozambique's credit rating from B to CCC after Mozambique's undisclosed debts were revealed.

72.     Following the EMATUM Exchange, in or about and between May 2016 and March 2017, ProIndicus and MAM defaulted on their loans, and Mozambique defaulted on the Eurobonds. As result of the scheme, EMATUM investors who subsequently held Eurobonds following the Exchange suffered losses.

**ATTACHMENT B**

**CERTIFICATE OF CORPORATE
RESOLUTIONS**

WHEREAS, Credit Suisse Securities (Europe) Limited (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Money Laundering and Asset Recovery Section ("MLARS") and Fraud Section (the "Fraud Section"), and the United States Attorney's Office for the Eastern District of New York (collectively the "Offices") regarding issues arising in relation to a conspiracy to commit wire fraud; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Offices; and

WHEREAS, Credit Suisse Group AG's General Counsel, Romeo Cerutti, and its Global Head of Litigation and Investigations, Alan Reifenberg, together with outside counsel for the Company, have advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Offices;

Therefore, the Board of Directors has RESOLVED that:

1. The Company (a) acknowledges the filing of the one-count Information charging the Company with: one count of conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349; (b) waives indictment on such charges and enters into this plea agreement (the "Agreement") with the Offices; and (c) agrees to pay (or to have paid on its behalf by Credit Suisse Group AG) a fine of $500,000 with respect to the conduct described in the Information in the manner described in this Agreement; and

(d) admits the Court's jurisdiction over the Company and the subject matter of such actions and consents to the judgment therein.

2. The Company accepts the terms and conditions of the Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Eastern District of New York; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the Offices prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3. The Global Head of Litigation and Investigations of Company, Alan Reifenberg, is hereby authorized, empowered and directed, on behalf of the Company, to execute the Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the Global Head of Litigation and Investigations of Company, Alan Reifenberg, may approve;

4. The Global Head of Litigation and Investigations of Company, Alan Reifenberg, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.      All of the actions of the Global Head of Litigation and Investigations of Company, Alan Reifenberg, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

Date: __15.10.2021__

By: _____

Paul Hare

Corporate Secretary

Credit Suisse Securities (Europe) Limited

**ATTACHMENT C**

**<u>CERTIFICATION</u>**

To:    United States Department of Justice
Criminal Division, Money Laundering and Asset Recovery Section
Attention:  Chief, Bank Integrity Unit

United States Department of Justice
Criminal Division, Fraud Section
Attention:  Chief, FCPA Unit

United States Attorney's Office
Eastern District of New York
Attention:  Chief, Business & Securities Fraud Section

Re:    Plea Agreement Disclosure Certification

The undersigned certify, pursuant to Paragraph 10 of the Plea Agreement ("Agreement") filed on [Insert DATE] in the U.S. District Court for the Eastern District of New York, by and between the Offices and Credit Suisse Securities (Europe) Limited (the "Company"), that undersigned are aware of the Company's disclosure obligations under Paragraph 10 of the Agreement and that the Company has disclosed to the Offices any and all evidence or allegations of conduct required pursuant to Paragraph 10 of the Agreement, which includes evidence or allegations that may constitute a violation of federal wire fraud, securities laws, money laundering laws or the Foreign Corrupt Practices Act ("FCPA") had the conduct occurred within the jurisdiction of the United States ("Disclosable Information").  This obligation to disclose information extends to any and all Disclosable Information that has been identified through the Company's compliance and controls program, whistleblower channel, internal audit reports, due diligence procedures, investigation process, or other processes.  The undersigned further acknowledge and agree that the reporting requirement contained in Paragraph 10 and the representations contained in this certification constitute a significant and important component of the Agreement and the Office's determination whether the Company has satisfied its obligations under the Agreement.

The undersigned hereby certify respectively that he/she is the Chief Executive Officer ("CEO") of the Company and that he/she is the Chief Financial Officer ("CFO") of the Company and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Eastern District of New York.  This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record,

document, or tangible object shall be deemed to have been made in the Eastern District of New York.


By: _____        Dated: _____
    [NAME]
    CEO
    Credit Suisse Securities (Europe) Ltd.


By: _____        Dated: _____
    [NAME]
    CFO
    Credit Suisse Securities (Europe) Ltd.